89   409
153a 661

ADAM S. MATHESON and ROBERT C. NEAL, as Receivers of THE
AMERICAN TUBE AND IRON COMPANY, Respondents, *v.* CLIFTON
WHARTON, JR., as Assignee for the Benefit of Creditors of JACOB
JAMER, and THE NATIONAL TUBE WORKS COMPANY, Appellants.

*Contract — when its covenants are dependent — a failure to perform substantial cov-
enants bars an action by the party in default.*

One Jacob Jamer, finding that it would be difficult for him to meet at maturity
certain promissory notes made by him, upon which the National Tube Works
Company and the American Tube and Iron Company were respectively indors-
ers, entered into a written agreement with such corporations under which the
respective notes were to be renewed by them respectively, the agreement pro-
viding that Jamer should pay a certain proportion of the indebtedness at spec-
ified times, as security for which payments he assigned to the corporations cer-
tain accounts held by him against third parties.

The National Tube Works Company performed its part of the contract, but the
American Tube and Iron Company having passed into the hands of receivers
before certain of Jamer's notes indorsed by it became due, these notes were not
renewed by that company as provided by the agreement, but were protested,
and Jamer was compelled to make an assignment for the benefit of his
creditors.

Although the agreement entered into between the parties conferred upon the
National Tube Works Company and the American Tube and Iron Company the
right to collect the accounts transferred by Jamer, these corporations did not
do so, but permitted Jamer to collect them, and subsequent to his assignment
his assignee collected them.

Upon the trial of an action brought by the receivers of the American Tube and
Iron Company against the assignee of Jamer to compel him to pay over to the
plaintiffs the proportion of the proceeds of the assigned accounts claimed by it,

*Held,* that the promise to renew the notes from time to time was not merely
incidental and collateral, but was the main inducement on Jamer's part for pro-
viding the additional security, and that the American Tube and Iron Company,
having failed to comply with the provision of the contract by which it was to
renew the notes as they matured, was divested of all interest therein, and that
the plaintiffs could not recover.

APPEAL by the defendant, Clifton Wharton, Jr., as assignee for
the benefit of creditors of Jacob Jamer, from a judgment of the
Supreme Court in favor of the plaintiffs, entered in the office of
the clerk of the county of New York on the 2d day of April, 1895,
upon the report of a referee.

Also, appeal by the defendant, The National Tube Works Com-
pany, from so much of a judgment of the Supreme Court in favor

of the plaintiffs, entered in the office of the clerk of the county of New York on the 2d day of April, 1895, as directs the assignee of Jacob Jamer to pay the plaintiffs' costs and to pay out of the residue of the fund $7,155.13 to the plaintiffs, or as directs such assignee to pay to the plaintiffs any sum whatever from the fund derived from the collection of the assigned accounts, the subject of the action, and fails to direct that the defendant, The National Tube Works Company, be paid in full their claims out of said fund.

*Alfred Jaretzki,* for Clifton Wharton, Jr., appellant.

*James McKeen,* for National Tube Works Company, appellant.

*Edgar J. Nathan,* for the respondents.

PARKER, J. :

Prior to June 30, 1893, Jacob Jamer delivered to the National Tube Works Company, for value, several promissory notes aggregating $10,820.06, and to the American Tube and Iron Company notes aggregating $23,170.15. All of these notes had been indorsed by the payees and had been discounted and were outstanding in the hands of third parties on the date above mentioned.

Jamer, finding that it would be inconvenient, if not impossible, for him to meet the notes at maturity, so stated to the National Tube Works Company and the American Tube and Iron Company, and proposed an extension of time, by which twenty-five per cent of the indebtedness represented by the notes should be paid in six months, twenty-five per cent in nine months, twenty-five per cent in twelve months, and the balance in fifteen months ; and to secure such payment he proposed an assignment of accounts which he held against certain parties. The proposition was accepted and a tripartite agreement was entered into, in which Jamer was designated as the party of the first part, the National Tube Works Company party of the second part, and the American Tube and Iron Company party of the third part. It fixed the time of payment as he had proposed, and stated the method by which the extension was to be accomplished, which should be a renewal of the notes outstanding by the parties of the second and third parts so as to conform with such extension.

On the part of Jamer it was agreed to pay the amount of the notes in four installments at the several periods agreed upon, and to secure such payment Jamer assigned by the agreement certain accounts. The right to anticipate the payment of any of the installments was reserved to Jamer, the parties of the second and third parts agreeing that upon the payment of any installment they would re-assign to him a proportionate amount of the accounts assigned under the agreement, and that upon payment of all of the installments they would re-assign all of the accounts.

The party of the second part, the National Tube Works Company, made performance of its part of the contract and is entitled to all of the benefits secured to it by the agreement. The American Tube and Iron Company passed into the hands of receivers on the 27th day of July, 1893, and, among the notes maturing immediately which it had agreed to renew, was one for $3,500 which became due July twenty-eighth, another for $1,739.80, which matured July twenty-ninth, and another for $829.50, which matured July thirtieth. These notes were not renewed as by the agreement it was provided they should be, although Jamer and his counsel urged upon the receivers the importance of their renewal. Instead, they were protested, and Jamer, on the thirty-first day of July, three days after the first note was protested, was compelled to make a general assignment for the benefit of his creditors. While the agreement conferred upon the parties of the second and third parts the right to collect the accounts transferred by it, they did not in fact do so, but permitted Jamer to collect them, and after his assignment his assignee went on with their collection, the result being that at the time of the commencement of this suit there was in the hands of Jamer's assignee the sum of $12,380.57, which had been collected from the assigned accounts. The plaintiffs demanded from the assignee such a proportion of this sum as the amount of notes upon which the American Tube and Iron Company was the indorser bore to the amount of the notes upon which the National Tube Works was the indorser. If the American Tube and Iron Company had made performance of its contract, as did the party of the second part, Jamer's assignee would have been without excuse in failing to comply with the receivers' demand; as it had not, he insisted that the plaintiffs were not entitled to any portion of the assigned

accounts. Thereupon this suit was brought, upon the equity side of the court, to compel the assignee to pay over to the plaintiffs that part of the proceeds claimed by them.

The learned referee decided that the American Tube and Iron Company did not comply with all of the provisions of the contract, in that it failed to renew the notes, to which we have referred, as they matured, but held that such omission did not annul the provisions of the contract assigning the accounts, or divest the American Tube and Iron Company of its interest in such accounts.

This presents the only question which we shall consider, as we approve of the views of the referee in all other respects, The ground upon which he based his decision, that the failure of performance on the part of the American Tube and Iron Company did not have the effect to deprive it of the right to its full share of the proceeds of the assigned accounts, was that the contract when signed was completely executed on Jamer's part, and partly executed and partly to be executed on the part of the American Tube and Iron Company and the other party to the contract. That the contract was one of mutual promises, each promise being the consideration for the other, and, therefore, the promise, not the performance of it, constituted the consideration. In support of his position he cited *Philpot* v. *Gruninger* (14 Wall. 570) and *Boone* v. *Eyre* (reported in note to 1 H. Bl. 273).

It may be said, if he is right in his interpretation of the contract, that the cases cited furnish support for the legal conclusion reached. But the facts of those cases, as we read them, do not furnish any assistance in determining whether this contract should be treated as executory, or as one executed by one party and partly executed, and partly to be executed, by the other parties at the moment of its execution.

A remark of Foote, J., in *Grant* v. *Johnson* (5 N. Y. 247) seems to apply with such force to these, as well as to the other cases to which our attention has been called, that we quote it: " So many decisions have been made on the vexed question of what are and what are not dependent covenants, and so many of them are irreconcilable, that they rather perplex than aid the judgment in determining a given case."

The opinion in *Boone* v. *Eyre* was written by Lord MANSFIELD, and

Pollock, in his work on Contracts (6th Eng. ed. p. 246), says: "From Lord Mansfield's time to the present attempts have been made to lay down rules for determining, in the absence of express provisions or other clear indication of intent, the relation of the one ·party's obligation to the other as regards the order of performance of mutual promises and the extent to which either is bound to accept performance of part, notwithstanding failure to perform other parts. In the earlier decisions, the Court inclined to treat the several terms of a contract * * * as separate and independent promises, paying little regard to the effect which default in some or one of them might produce in defeating the purpose of the contract as a whole. At this day the tendency is the other way. The Court looks to the purpose and effect of the contract as a whole as a guide to the probable intention of the parties, and the presumption, if any there be, is that breach or default in any material term of a contract between men of business amounts to default in the whole."

And again, at page 248, that author says: "But when there is a contract made by mutual promises we may have to inquire whether, in addition to each promise or set of promises being the consideration for the other, the performance thereof on the one side is not a condition, precedent or concurrent, of the right to claim performance on the other. There is no logical reason why it should not be so, or why express words should be required to manifest an intention that it should. Each party's promise is the consideration for the promise of the other, not for the performance which is due by reason of the promise. What are the terms and conditions of the duty created by the promise is another matter."

In considering the tests which may be applied he says, at page 250 : " Can it be said that the promisee gets what he bargained for, with some shortcoming for which damages will compensate him ? Or is the point of failure so vital that his expectation is in substance defeated ? "

The logical and necessary result of the position taken by the referee is that if the American Tube and Iron Company had failed to renew any of the notes described in the contract, yet it could recover, because, as he asserts, the contract was executed by one party, and partly executed by the others the moment it was signed. But in such case clearly Jamer's expectations would have been defeated, not only

in substance, but entirely. What he was aiming at, as appears from every feature of the contract, was to procure an extension of the time within which to pay thirty odd thousand dollars, which the notes outstanding represented. To accomplish that result he was willing to assign certain accounts which he held against other parties. There is no hint of any other intention in this contract. It was not provided that the avails of these accounts should be applied in payment of the notes outstanding.

There was no authority to make any application whatever until six months thereafter, when the first installment should become due, and then it was to be devoted to the payment of one-fourth of his obligations, which would then be represented by renewal notes. Jamer was attempting to protect his credit through a period of great financial depression, and that could only be accomplished by securing his notes from protest, and, therefore, the parties of the second and third parts were required to renew the notes as they should mature.

This they promised to do in order to secure the collateral which he offered them as an inducement. It is true that the word collateral was not used, but that the accounts were intended as collateral security for the faithful performance of his promise to pay the sum which his notes represented in four equal installments in six, nine, twelve and fifteen months, is apparent.

The clause following the promise to pay begins with the words, "To secure the prompt and punctual payment of said sums of money, and each installment thereof at the time above provided, the party of the first part does hereby assign —"

And in the sixth clause it further provided "that as each installment of the indebtedness hereinabove recited is paid off, the parties of the second and third parts will re-assign to the party of the first part a proportionate amount of the accounts assigned to and held up by them under this agreement, and that upon the payment of all of the installments hereinabove provided for, and of any and all interest and charges that may have accrued thereon, they will re-assign all the accounts enumerated in said Schedule A, or such others as may have been substituted therefor, to the party of the first part."

The conduct of the parties was in harmony with the apparent language of the contract. The parties of the second and third

parts did not undertake the collection of the accounts. Jamer collected such as were collected, and the proceeds resulting from his efforts in that direction are the subject of this suit.

If the legal interpretation put upon this contract by the referee be sound, then it necessarily follows that immediately upon its being signed, if the parties of the second and third parts had neglected or refused to renew any of the notes referred to in it, and had permitted them to mature and be protested against Jamer while in the hands of third parties, nevertheless, the parties of the second and third parts would have been entitled to the collateral to protect them as against their liability as indorsers on the notes. Such, certainly, was not the intention of the parties, and the contract does not so indicate from whatever point of view it may be examined.

The promise to renew the notes from time to time so that Jamer should not be called upon to pay any of them under six months, and others for periods as far away as fifteen months, was not merely incidental and collateral. It was the main inducement on Jamer's part for providing the collateral. The object was to secure himself against the threatening impairment of his credit. He apprehended financial ruin in the event that his paper should be dishonored, and thirty days later, when, through the American Tube and Iron Company's failure to perform its contract, his paper went to protest, his apprehensions were proved to be well founded.

Respondent's argument is that Jamer covenanted to pay his just debts, and, as security, assigned certain accounts to his two creditors, in consideration whereof they extended the time of payment and agreed to renew certain notes as the same matured. Thus the contract and consideration were wholly executed except as to the renewal of the notes, which could only be done in the future, and was a mere incident to the extension. But this position does not correctly present the facts.

The parties of the second and third parts were not then his creditors. All of the notes were then in the hands of third parties. As they bore the indorsement of the second and third parties they were threatened with liability thereon should Jamer fail to pay. To protect themselves they consented to assume the burden of renewing the notes and thus extending the time of payment for the time specified in the contract.

The contract contains a phrase that the parties of the second and third parts " agree to extend and do hereby extend " the time of payment of the said indebtedness, but that phrase did not effect an extension as there was no indebtedness due to them; instead, it was due to third parties, who held the notes. While these words were *in presenti*, they should be construed in the future tense. Otherwise they are meaningless, for there was nothing for them to operate on.

Without a renewal of the notes there could be no extension of time, and, therefore, the contention that the paragraph relating to the extension constituted the consideration for the contract, and the renewals were a mere incident to it, is absurd. The plan of the contract was to procure such renewals of these notes as' that one-fourth should be paid at each period of six, nine, twelve and fifteen months.

In giving expression to the agreement of the parties in this respect, the following language was used :

" The parties of the second and third parts agree to extend, and do hereby extend, the time of the payment of said indebtedness so that one-fourth of the entire amount due each of the parties of the second and third parts shall be due and payable in six months from date, another one-fourth part in nine months from date, another one-fourth part in twelve months from date, and the remainder in fifteen months from date. And said parties of the second and third parts agree to renew the notes heretofore given by the party of the first part as the same mature, so as to conform with such extension."

The use of the words " do hereby extend " furnishes the basis for the argument made by the respondents, that by the agreement the parties of the second and third parts extended, not promised to extend, but actually did extend, the time of payment. But, as we have already seen, they did not extend the time of payment, for there was no indebtedness due them. The notes were not in their possession or under their control, and by that agreement they could not affect Jamer's liability thereon to the parties who held them. Their promises to renew the notes contained in the latter part of the last-quoted clause develops the plan by which they undertook to insure Jamer against the notes becoming dishonored within the period which they had promised he should have to pay the amounts secured by them.

Having in mind the situation of the parties, the object which they intended to accomplish and the general scheme of the contract, the only reasonable construction which can be given to the opening clause of the provision which we have quoted, is that by it the parties of the second and third parts agreed to extend the time of payment for the periods therein named, the promise to be effectuated by renewal of the several notes as they should mature, so as to conform with such extension. Such a construction leaves no basis whatever for the claim that the renewal of the notes was a mere incident to the extension.

If we are right in the views expressed, it follows that the American Tube and Iron Company, having failed to perform its contract in a substantial and important respect, the plaintiffs cannot recover.

The judgment should be reversed and a new trial ordered, with costs to the appellants.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Judgment reversed, new trial ordered, costs to appellants to abide event.